Todd C. Theodora, Esq.  (State Bar No.  120426)
TTheodora@tocounsel.com
Andrew B.  Breidenbach (State Bar No.  281586)
abreidenbach@tocounsel.com
Samuel G.  Fogas, Esq.  (State Bar No.  328185)
sfogas@tocounsel.com
THEODORA ORINGHER PC
1840 Century Park East, Suite 500
Los Angeles, California 90067-2120
Telephone: (310) 557-2009
Facsimile: (310) 551-0283

Attorneys for Plaintiff SEAGUARD ELECTRONICS, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SEAGUARD ELECTRONICS, LLC, a Nevada corporation,<br><br>         Petitioner,<br><br>   vs.<br><br>AUDIOVOX CORPORATION, nka VOXX INTERNATIONAL CORPORATION, a Delaware corporation,<br><br>         Respondent. | Case No.  2:22-cv-1651<br><br>**PETITIONER SEAGUARD ELECTRONICS, LLC'S PETITION TO CONFIRM ARBITRATION AWARD** |

1247812.4/81881.05002

PETITION TO CONFIRM ARBITRATION AWARD

Pursuant to Title 9 of the U.S. Code (the "Federal Arbitration Act"), specifically 9 U.S.C. § 9, petitioner Seaguard Electronics, LLC petitions this Court to confirm the Partial Final Award with Regard to the Bifurcated Issues (the "Final Award"[1]) issued by the American Arbitration Association ("AAA") on March 3, 2022, in the arbitration captioned, *Seaguard Electronics, LLC v. Audiovox Corporation, nka VOXX International Corporation*, AAA Case No. 01-18-0003-0518 (the "Arbitration").  In support of this Petition, Seaguard alleges:

## THE PARTIES

1. Petitioner Seaguard Electronics, LLC ("Seaguard" or "Petitioner") is a limited liability corporation organized and existing under the laws of the State of Nevada, with operations in Southern California.  Seaguard is a limited liability corporation whose sole member, Mr. William Tsumpes, is domiciled in Nevada.  Seaguard was the claimant and counter-respondent in the Arbitration.

2. Respondent Audiovox Corporation, nka VOXX International Corporation ("VOXX" or "Respondent") is a publicly traded company with over 800 employees and approximately $575 million in reported revenue for fiscal year 2021.  VOXX is organized under the laws of the State of Delaware, with its principal place of business in Florida.  (*See* Final Award at 3.)

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action based on complete diversity of citizenship under 28 U.S.C. § 1332(a)(2).  Seaguard is a citizen of Nevada, and VOXX is a citizen of the States of Delaware and Florida.  The amount in controversy is $40,242,676.60, which is the amount awarded to Seaguard as compensatory damages, attorneys' fees, and costs in the Final Award.

4. The Court has personal jurisdiction over VOXX pursuant to 9 U.S.C.

---

[1] The Final Award is included with this Petition as ***Exhibit J*** to the Declaration of Andrew B. Breidenbach.

§ 9, because Seaguard and VOXX agreed in the governing contract—the "*Supply Agreement*"—that a court judgment shall be entered upon an award made pursuant to an arbitration thereunder but did not specify the court for doing so, and this Petition is made to the United States Court in and for the District within which the Final Award was made. This Court also has personal jurisdiction over VOXX because VOXX maintains minimum contacts with California, and the claims in the Arbitration arise out of VOXX's minimum contacts with California. Such contacts include, but are not limited to:

      a.    VOXX does business in California, including selling products in California.

      b.    This dispute between Seaguard and VOXX arose from VOXX's breach of the Supply Agreement, pursuant to which Seaguard was to provide goods and services to VOXX from California (and elsewhere).

      c.    VOXX's executives and agents traveled to California to negotiate the Supply Agreement with Seaguard, and the Supply Agreement ultimately was executed by both Seaguard and VOXX in California.

      d.    The Supply Agreement provides that any dispute arising between the parties regarding the contract would be arbitrated with AAA in Orange County, California. Pursuant to that provision, a ten-day arbitration hearing commencing on June 21, 2021, was held in Orange County, California (specifically, Tustin, California).

      e.    The Final Award was made in Orange County, California, which is in this District.

5.    Venue is proper in this Court pursuant to 9 U.S.C. § 9 and 28 U.S.C. § 1391(a)(2), because the Arbitration was conducted and the Final Award was made in Orange County, California, which is in this District.

# BACKGROUND[2]

6. Seaguard is a technology company that specializes in the development and servicing of alarm signaling, alarm automation, and wireless communications technologies for various uses. It develops custom wireless communication devices and systems for its customers, in particular GPS tracking devices used for stolen-vehicle recovery. (Final Award at 3.)

7. VOXX is an international electronics company specializing in the distribution and sales of original equipment and after-market automotive electronics, including mobile video, car security, car audio, remote start, collision avoidance, and satellite radio products. VOXX is a wholesaler whose main customers are distributors, new car dealerships, and retail stores. (Final Award at 3.)

8. In 2005, Seaguard began working with VOXX to develop a custom GPS tracking and stolen-vehicle recovery product designed to integrate with VOXX's existing auto security and remote start products. Seaguard funded the development of this product (ultimately called the "PROPT 20") entirely on its own; VOXX agreed that if that development satisfied VOXX's high standards, then VOXX would enter into a supply agreement with minimum revenue guarantees, allowing Seaguard to realize a financial return on its investment and technology.

9. In March 2007, after more than two years of product development, more than a year of product testing, and lengthy contract negotiations, Seaguard and VOXX entered into a contract titled, "SEAGUARD ELECTRONICS, LLC / Audiovox Corporation Supply Agreement / Seaguard™ GPS Tracking Systems," effective as of February 28, 2007 (the "*Supply Agreement*"). (Final Award at 4.) The Supply Agreement is included with this Petition as *Exhibit A* to the Declaration of Andrew B. Breidenbach ("Breidenbach Decl."). (*See* Breidenbach Decl., Ex. A (hereinafter,

---

[2] The facts alleged in this Petition are drawn from the Final Award (verbatim wherever possible, including where language is not placed in quotation marks).

the "**Supply Agreement**"), ¶ 2.)

10. The Supply Agreement created an exclusive relationship between VOXX and Seaguard. So long as the Supply Agreement was in place, Seaguard could not sell its stolen-vehicle recovery GPS tracking system to a VOXX competitor or customer in the Retail, New Car, or Original Equipment markets. In return, VOXX agreed that Seaguard would be VOXX's exclusive supplier of GPS tracking devices and would provide VOXX with related technical services and support, for as long as the Supply Agreement was in place. (Final Award at 29; Supply Agreement, ¶ 2.)

11. The Supply Agreement's initial term was three years, and it automatically renewed for successive one-year terms thereafter. These exclusivity and renewal provisions were required by VOXX. They gave VOXX the power to control the commercialization of Seaguard's GPS tracking devices in the United States (and beyond) for an indefinite period of time, and thus were a bargained for advantage VOXX obtained relative to control over new technology owned by Seaguard. (Final Award at 30; Supply Agreement, ¶ 18.)

12. The Supply Agreement contemplates that VOXX owed Seaguard certain financial obligations during the term of the Supply Agreement: namely, (a) to purchase 2,000 units of Seaguard's GPS tracking devices per month for the initial three-year term and for any one-year renewal term, and (b) to pay a "shortfall charge" of $159.00 per unit (net of other payments made to Seaguard) if VOXX failed to satisfy its minimum purchase obligation during any milestone period. Using simple math based upon the formula set forth in the Supply Agreement, VOXX's minimum financial obligation to Seaguard when it signed the Supply Agreement in mid-March 2007 was $3,816,000 per year if it never ordered a single Seaguard GPS tracking device. That was the price VOXX agreed to pay to control the commercialization and dissemination of Seaguard's GPS tracking systems. (Final Award at 33; Supply Agreement, ¶ 3.)

13. The Supply Agreement provided that "[a]ny delay or failure to enforce

any provision of this Agreement shall not constitute a waiver of the right to thereafter enforce each and every provision of this Agreement." The Supply Agreement also stated that its terms "may only be waived by a written instrument executed by the Party waiving compliance." (Final Award at 35; Supply Agreement, ¶ 25.)

14.  Throughout the life of the Supply Agreement, Seaguard honored its obligations to sell its GPS tracking devices exclusively to VOXX and to fully provide technical and support services to VOXX. VOXX received the benefit of the exclusivity because it not only locked up Seaguard's GPS devices as originally developed, but it also locked up the adjustments Seaguard made to the technology at VOXX's request and future generations of Seaguard's GPS devices. (Final Award at 29.)

## **VOXX BREACHES THE SUPPLY AGREEMENT**

15.  Ultimately, VOXX breached the Supply Agreement in several ways.

16.  First, VOXX failed to purchase its minimum monthly requirement in any milestone interval during the life of the Supply Agreement. Eventually, VOXX's "shortfall" was more than 240,000 units. (Final Award at 46.)

17.  Second, VOXX never satisfied the "order processing" provisions of the Supply Agreement, which established specific lead times and minimum sizes for its orders from Seaguard. (Final Award at 32.)

18.  Third, VOXX breached the exclusivity provisions of the Supply Agreement by working with multiple competitors of Seaguard to develop and distribute competing GPS tracking devices, thus depriving Seaguard of expected revenue and market opportunities during the period when its products were competitive. (Final Award at 41-42.)

19.  VOXX also breached the implied covenant of good faith and fair dealing. VOXX concealed from Seaguard that it had abandoned the Seaguard relationship and was shelving Seaguard's products to work with other suppliers. Rather than coming clean to Seaguard, VOXX repeatedly, falsely promised to work with Seaguard to

1  generate sales volume, create a market for the products, and adhere to the Supply
2  Agreement. (Final Award at 41-42.)

3      20.    Seaguard did not learn of VOXX's abandonment of Seaguard until
4  Seaguard's principal visited VOXX's booth at an industry trade show (the Consumer
5  Electronics Show in Las Vegas) in January 2018, where he discovered that VOXX
6  had abandoned Seaguard's products and was selling competing products. (Final
7  Award at 31.)

8      21.    Upon learning that VOXX had secretly and opportunistically abandoned
9  the Seaguard-VOXX relationship, Seaguard promptly and timely initiated the
10 Arbitration in August 2018. (Final Award at 31, 72-73.)

11 **THE ARBITRATION AND THE BIFURCATED PROCEEDINGS**

12     22.    The Supply Agreement provides that in the event of a dispute between
13 the parties, such dispute shall be resolved by binding arbitration before AAA and in
14 accordance with AAA Rules. (Final Award at 4; Supply Agreement, ¶ 30.)

15     23.    VOXX and Seaguard agreed in the Supply Agreement that "the
16 arbitrator's award shall follow the plain meaning of the agreement and shall be final,
17 binding, and enforceable in a court of competent jurisdiction." (Final Award at 4-5;
18 Supply Agreement, ¶ 30.)

19     24.    On August 10, 2018, Seaguard initiated the Arbitration against VOXX
20 under the Supply Agreement by filing a Demand for Arbitration with AAA. (Final
21 Award at 5; Breidenbach Decl., ¶ 3, Ex. B ("***Demand for Arbitration***").) Seaguard
22 brought two distinct sets of causes of action: (1) claims for breach of the Supply
23 Agreement; and (2) claims for VOXX's infringement of Seaguard's patents.
24 (Demand for Arbitration at 1; Final Award at 5.)

25     25.    The parties jointly selected Rebecca Callahan, Esq. as arbitrator (the
26 "***Arbitrator***") in the Arbitration. Pursuant to the parties' mutual agreement, AAA
27 formally appointed Ms. Callahan as the Arbitrator on January 23, 2019. (Final Award
28 at 1; Breidenbach Decl., ¶ 4, Ex. C ("***Notice of Designation of Arbitrator***").)

26. On May 1, 2019, the Arbitrator found that she had jurisdiction, and that, "[b]y stipulation of the parties, through their counsel, there are no challenges to the jurisdiction of the Arbitrator or the arbitrability of the issues submitted for determination of this arbitration." (Breidenbach Decl., ¶ 5, Ex. D at 4, § 5.1 ("***Arbitrator's Order No. 1***"); Final Award at 5.)

27. On December 10, 2020, based on the general agreement of Seaguard and VOXX, the Arbitrator bifurcated the Arbitration into two distinct phases. The **first phase** of the Arbitration would fully resolve Seaguard's contract claims and VOXX's corresponding defenses and counterclaims. The **second phase** of the Arbitration would resolve Seaguard's patent infringement claims and VOXX's corresponding defenses and counterclaims. The Arbitrator and the parties referred to the phase one issues as the "***Bifurcated Issues***." (Breidenbach Decl., Ex. E at 2-4 ("***Arbitrator's Order No. 11***"); Final Award at 6-9.)

28. The Arbitrator conducted an evidentiary hearing on the Bifurcated Issues on June 21, 22, 23, 24, 26, 28, 29, and 30, and August 20 and 27, 2021 (the "***Hearing***"). Over the course of the ten-day Hearing, over 300 exhibits were admitted into evidence, and the Arbitrator heard testimony from eighteen fact witnesses and three expert witnesses. (*See* Final Award at 9, 13-15.)

29. After the conclusion of the Hearing, the parties submitted closing and reply briefs. (Final Award at 10-11.)

30. On November 1, 2021, the Arbitrator requested an extension from the parties to extend her time to issue the interim award on the Bifurcated Issues to November 29, 2021. (Breidenbach Decl., Ex. F at 1 ("***AAA Letter Requesting Party Agreement for Extension of Award***").)

31. On November 3, 2021, AAA confirmed the parties' agreement to the Arbitrator's request to extend the time for the Arbitrator to issue the interim award on the Bifurcated Issues to November 29, 2021. (Breidenbach Decl., Ex. G at 1 ("***AAA Letter Confirming New Award Due Date***").)

1247812.5/81881.05002
8
PETITION TO CONFIRM ARBITRATION AWARD

# THE INTERIM AWARD
## AND THE ARBITRATOR'S EXPRESS FINDINGS

32. On November 29, 2021, the Arbitrator issued her Interim Award with Regard to the Bifurcated Issues. (Breidenbach Decl., Ex. H (hereinafter, the "***Interim Award***").)

33. The Interim Award was exhaustive, spanning 69 single-spaced pages, and it found that Seaguard was the "prevailing party" on the Bifurcated Issues. Applying the Supply Agreement as written, the Interim Award awarded Seaguard $39,444,475.00 in "compensatory damages" against VOXX. (Interim Award at 68, § 7.1.)

34. In the Interim Award, and later the Final Award, the Arbitrator conclusively determined that "***[t]he evidence in this case supports the determination that VOXX breached the Supply Agreement on several grounds, as well as the implied covenant of good faith and fair dealing***." (Interim Award at 41 (emphasis added).) The Arbitrator based this determination on the following findings (among many others):

>   a.   "***The fact that VOXX did not meet its minimum purchase requirements was due to the acknowledged failings of VOXX's efforts and its decision to divert its resources to exploring and entering into supply arrangements with other suppliers of GPS tracking products***. These circumstances and events do not operate to excuse VOXX from its purchase obligations or its shortfall liability under the Supply Agreement, especially since VOXX in fact exercised control over the marketing and sale of the Seaguard GPS tracking products to keep the Seaguard products out of the Retail space completely and on the shelf while it promoted CarConnection Pro (2012-2013), supplied by Agnik and Omnilink, and PROSVR (2016-2019), supplied by

1  ProCon." (Interim Award at 43 (emphasis added).)

2  b. "That VOXX wanted to control the Seaguard GPS tracking system was evident by the fact that VOXX (a) rejected Tsumpes' offer to terminate the Supply Agreement and forgive VOXX's shortfall obligation in exchange for payment of $1 million (Seaguard's development costs), (b) never sought to terminate the Supply Agreement, *even after it decided to abandon the Seaguard product and go with another supplier*, and (c) *concealed from Seaguard* the fact that it had decided to abandon the Seaguard product and go with another supplier. The inference drawn from this conduct by VOXX is that it did not want Seaguard's PROPT 20 or PROPT 10 in the hands of one of its competitors, and it did not want Seaguard's product to compete with ProCon's PROSVR GPS tracking system once VOXX decided to promote that product." (Interim Award at 29 (emphases added).)

c. "VOXX received the benefit of exclusivity and control over the Seaguard GPS tracking system technology in the Retail, New Car and Original Equipment markets, which *it took advantage of when it started buying GPS tracking systems from Seaguard's competitors while keeping the Seaguard products out of the marketplace*." (Interim Award at 55 (emphasis added).)

d. "To the extent that VOXX could not sell or chose not to sell Seaguard's products, and did not want to be obligated to make minimum purchases, it could have terminated the Supply Agreement and ended the supply relationship with Seaguard, and along with it both parties' exclusivity obligations. *The inference*

*drawn and the determination made in this arbitration is that VOXX made a strategic business decision to not terminate the Supply Agreement because it wanted to tie Seaguard to exclusivity with VOXX so that Seaguard could not sell its GPS tracking systems to VOXX's competitors or customers in the Retail, New Car or Original Equipment markets*." (Interim Award at 44 (emphasis added).)

e. "The fact that VOXX explored and entered into supply arrangements with other GPS tracking system vendors, and *purposefully withheld that information from Seaguard* while *continuing to interact with Seaguard as if the relationship was healthy and in place* was a *calculated, strategic business decision on VOXX's part.* VOXX received the benefit of exercising control over the Seaguard products, and put them on the shelf while it pursued opportunities with others without facing competition from the Seaguard GPS tracking products in the hands of a competitor. *The financial risk associated with that business decision is the agreed-upon shortfall charge – a heavily negotiated term that VOXX agreed to. It is not a windfall to Seaguard because*, through VOXX's actions of keeping the Supply Agreement in place, *Seaguard's GPS tracking system products were kept off the market at a time when they were competitive.*" (Interim Award at 57 (emphasis added).)

f. On material issues, the testimony of Aron Demers, VOXX's Senior Executive Vice President, "was inconsistent, at best, and *not credible, at worst*." (Interim Award at 34 (emphasis added).)

g.  "The evidence showed that *Seaguard worked tirelessly for VOXX throughout the course of their 10+ year relationship*, that Seaguard routinely provided free services to VOXX and its customers (e.g., custom websites, on-site training and testing, custom products and features) and did so in the hope of helping VOXX increase its sales volumes to a point that its shortfall would be erased.  VOXX's actions show that it purposefully engaged and pursued a supply relationship with Seaguard.  Given that VOXX is a publicly-traded company with many years of experience working with suppliers and vendors of various sorts, it simply is not credible that VOXX would stay in a relationship with Seaguard if the products or service Seaguard was supplying did not work.  *The longevity of the supply relationship, as well as the frequency of VOXX's engagement with Seaguard was strong evidence and supports the ultimate determination that Seaguard substantially performed its obligations under the Agreement.*"  (Interim Award at 40 (emphasis added).)

h.  "*Seaguard acted reasonably and in good faith* when it refrained from assessing the shortfall charge until it learned in January 2018 that *VOXX had abandoned the relationship and gone with another supplier without telling Seaguard*."  (Interim Award at 55 (emphasis added).)

35.  The Interim Award determined that Seaguard was the "prevailing party" on its contract claims and reserved jurisdiction (1) to hear and determine the parties' request for an award of attorneys' fees and costs, and (2) to hear and determine the patent issues.  (Interim Award at 68-69, §§ 7.5, 7.6.)

## POST-INTERIM AWARD MOTIONS

36. On December 30, 2021, Seaguard moved, pursuant to the Supply Agreement's prevailing party fee-shifting provision, for reimbursement of certain costs and attorneys' fees it incurred successfully prosecuting the Bifurcated Issues. VOXX opposed Seaguard's motion only in limited respects. (Supply Agreement, ¶ 23.)

37. On January 4, 2022, VOXX filed a Motion to Modify the Interim Award. Seaguard opposed VOXX's motion.

38. On February 22, 2022, the Arbitrator held oral argument, by video, on the parties' post-Hearing motions.

39. On February 24, 2022, the Arbitrator declared the Hearing and record on the Bifurcated Issues closed and identified March 24, 2022, as the last date for her to issue an award on the Bifurcated Issues. (Breidenbach Decl., Ex. I at 1 ("***Letter Closing Hearing***").)

## THE FINAL AWARD

40. On March 3, 2022, the Arbitrator issued the Final Award. The Final Award adopted and restated the Interim Award, denied VOXX's Motion to Modify the Interim Award, and granted in part Seaguard's motion for costs and attorneys' fees. (Breidenbach Decl., Ex. J (the "***Final Award***").)

41. The Final Award awarded Seaguard $39,444,475.00 in compensatory damages against VOXX. (Final Award at 76, § 10.1.)

42. In addition, the Final Award awarded Seaguard its reasonable attorneys' fees and costs in the amount of $798,201.60. (Final Award at 76, § 10.2.)

43. The total award on the Bifurcated Issues equals $40,242,676.60.

44. The Interim Award and Final Award are binding on the parties pursuant to the Supply Agreement. Further, the Arbitrator expressly found that the Final Award is final and complete with respect to the Bifurcated Issues: "The matters determined by [the Final Award] with respect to the submitted Bifurcated Issues,

including the determination of prevailing party attorney's fees and costs, do not impact or bear upon the determination of the 'patent' claims and issues, and the possible award of attorney's fees and costs after the conclusion of those proceedings. . . . It was always intended / expected that all claims and issues related to the submitted Bifurcated Issues would be fully resolved at the close of those proceedings." (Final Award at 4-5, 73; Supply Agreement, ¶ 30.)

## CONFIRMATION OF THE AWARD

45. The Federal Arbitration Act governs this confirmation proceeding because the Supply Agreement is a contract that evidences a business relationship and series of transactions involving interstate commerce. 9 U.S.C. § 2.

46. Section 9 of the Federal Arbitration Act provides that a party to an arbitration may apply for an order confirming an arbitration award within one year after such award is made. "If no court is specified in the agreement of the parties, then such application may be made to the United States district court in and for the district within such award was made." 9 U.S.C. § 9. A court "must grant such an order unless the award is vacated, modified, or corrected." *Id.* "[J]udicial review of an arbitrator's decision is both limited and highly deferential." *Barnes v. Logan*, 122 F.3d 820, 821 (9th Cir. 1997). Indeed, "[c]onfirmation is a summary proceeding," and "[n]either erroneous legal conclusions nor unsubstantiated factual findings justify a federal court review of an arbitral award." *Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1095 (9th Cir. 2011); *Bosack v. Soward*, 586 F.3d 1096, 1102 (9th Cir. 2009). Simply put, the FAA "does not sanction judicial review of the merits [of an arbitrated dispute]." *Lagstein v. Certain Underwriters at Lloyd's*, 607 F.3d 634, 640 (9th Cir. 2010)

47. The Arbitrator's exhaustive Final Award is unassailable: over 77 single-spaced pages, the Arbitrator painstakingly recounts the extensive record to expressly draw inferences and find scores of facts; exactingly applies those findings to the law; and resolves all of the claims, counterclaims, affirmative defenses, and arguments

raised by the parties with respect to the Bifurcated Issues. Most importantly, moreover, it faithfully applies the Supply Agreement as written.

48. This Court must issue an order confirming the Final Award because: (1) the Supply Agreement does not identify a specific court for the confirmation of the Final Award; (2) the Final Award was made in this District; (3) this Petition is made within one year of the date of the Final Award; and (4) the Final Award has not been vacated, modified, or corrected. Furthermore, the Supply Agreement states that "[t]he arbitrator's decision . . . shall be final, binding, and enforceable in a court of competent jurisdiction." (Supply Agreement, ¶ 30.)

49. Therefore, the Final Award should be confirmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Seaguard respectfully requests that the Court:

1. Confirm the Final Award against VOXX and enter judgment in conformity;

2. Award pre-judgment interest at the legal rate of 10% compound interest per year, running from the date the Arbitrator issued the Interim Award, pursuant to Cal. Civ. Code § 3289(b)[3];

3. Award post-judgment interest at the legal rate;

4. Award Seaguard its reasonable attorneys' fees and costs incurred in connection with confirming this Award, pursuant to the Supply Agreement's prevailing party fee-shifting provision and the law of this Circuit; and

5. Grant any other relief as the Court may deem proper.

/ / /

/ / /

---

[3] In a diversity action, "[p]re-judgment interest is governed by state law . . . , and state law provides that pre-judgment interest is available from the date the arbitration panel renders its award[.]" *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004).

| | |
|---|---|
| DATED:  March 11, 2022 | THEODORA ORINGHER PC |

By: *[signature]*
Todd C. Theodora
Andrew B. Breidenbach
Samuel G. Fogas
Attorneys for Plaintiff SEAGUARD
ELECTRONICS, LLC